# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | | |
|---|---|---|
| **GILBERT BURKE** | * | **CIVIL ACTION NO.   13-2154** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **SHERIFF LARRY G. COX, ET AL.** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Upon reference of the District Court pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned Magistrate Judge held an evidentiary hearing on July 22, 2014, for purposes of entertaining testimony and evidence on all remaining issues in the case.  Because the above-captioned matter and *Williams v. Johnson*, Civ. Action No. 13-0478 (W.D. La.) share common questions of law and fact, the undersigned joined the two cases for hearing only.  Fed.R.Civ.P. 42(a)(1).  At the conclusion of the presentation of evidence by all parties on the issue of administrative exhaustion, and again at the close of the case, defendants moved for judgment on partial findings (incorrectly styled as a "motion for judgment as a matter of law") [doc. # 29].  Also during the hearing, plaintiff moved for copies of video footage from July 12 & 14-17, 2014 [doc. # 30].  More recently, on September 5, 2014, plaintiff filed a motion for appointment of counsel, together with a request for transfer supported by allegations of retaliation [doc. # 34].

For reasons set forth below, it is recommended that the motion for judgment on partial findings [doc. # 29] be DENIED; it is further recommended that plaintiff Gilbert Burke's motion for copies of video footage [doc. # 30] be DENIED; it is further recommended that plaintiff Gilbert Burke's claims be DISMISSED, without prejudice, on the merits, but DISMISSED with

prejudice for purposes of proceeding in forma pauperis pursuant to 28 U.S.C. § 1915(d); it is

further recommended that plaintiff's motion for appointment of counsel and transfer, with

associated complaints of retaliation [doc. # 34] be DENIED.

### Background

On June 27, 2013, Gilbert Burke, an inmate in the custody of Louisiana's Department of

Public Safety and Corrections ("DOC"), who, until September 5, 2014 (*see* doc. # 35), was

housed at the Madison Parish Detention Center ("MPDC"), filed the instant pro se civil rights

complaint under 42 U.S.C. § 1983 against various MPDC officials/officers:  Sheriff Larry Cox,

Major Antonio Johnson, Captain McCloud, and Captain Brooks.  Burke complained that he was

exposed to unreasonable levels of environmental/second hand tobacco smoke ("ETS") at the

MPDC facility, and thus, sought a transfer to a non-smoking facility.

On September 30, 2013, the court determined that plaintiff's complaint, as amended,

sufficiently pleaded a cause of action, and ordered service on defendants.  (Sept. 30, 2013, Mem.

Order [doc. # 11]).  Defendants filed their answer on November 18, 2013.  [doc. # 17].  After the

close of discovery, defendants filed a motion for summary judgment.  [doc. # 19].  On May 5,

2014, the undersigned recommended that the motion be granted-in-part, and that plaintiff's

claims against defendant, Captain Brooks, be dismissed with prejudice, but that the motion

otherwise be denied, and the matter referred for an evidentiary hearing.  (May 5, 2014, Report

and Recommendation ("R&R") [doc. # 21]).  On May 30, 2014, the District Court adopted the

R&R, dismissed Captain Brooks, and referred the matter to the undersigned to hold an

evidentiary hearing.  (May 30, 2014, Judgment [doc. # 22]).

In accordance with the District Court's directive, the undersigned scheduled the matter

2

for an evidentiary hearing, representing "**a complete hearing of all witnesses and evidence to be presented by all parties of record**."  (June 2, 2014, Order [doc. # 23]).  The evidentiary hearing pursuant to 28 U.S.C. § 636(b)(1)(B) and *Flowers v. Phelps*, 956 F.2d 488 (5th Cir.1992), *modified on other grounds*, 964 F.2d 400 (5th Cir.1992), was held on July 22, 2014.  The matter is now before the court.

<u>**Hearing Testimony and Evidence**</u>

At the hearing, the court heard testimony from plaintiffs, Lawrence Williams and Gilbert Burke; plaintiffs' witnesses:  Michael Gordon, Toby Matt, Zenas Fruge', and Courtney Plumbar; and defense witnesses:  Sheriff Larry Cox, Antonio Johnson, and Gerald McCloud.  The court also received into evidence the following exhibits,[1]

**Defense Exh.  1)**    MPDC Administrate Remedy Procedure

**2)**    DOC Smoking Policy

**3)**    Blank Inmate Grievance Forms

**4)**    Hand-written Grievances Signed by Lawrence Williams

**5)**    Voluntary Statement of Lester Turpin, dated January 22, 2014

**6)**    Commissary Records of Gilbert Burke

**Plaintiff Exh. 8)**    Inmate Grievance Forms Signed by Gilbert Burke

**Defense Exh.  9)**    DVDs of Surveillance Video from the MPDC

**Plaintiff Exh. 10)**    Hand-Drawn Depiction of Dormitory

---

[1]  Defendants' proposed Exhibit No. 7 included Gilbert Burke's medical records, to which Burke objected because they were incomplete.  The court sustained the objection.  Plaintiff Exhibit No. 11 was withdrawn.

**Defense Exh.  12)**     Deposition Transcript of Lawrence Williams

I.     **Hearing Testimony**

1)     <u>Lawrence Williams</u>

Lawrence Williams is presently incarcerated at the MPDC, where he has remained for the past 27 months.  He arrived at the MPDC on May 25, 2012, and was placed in C Dormitory.  Williams asked for grievance forms, but never received any.  Accordingly, he wrote his grievance on a piece of paper, which is reflected as Exhibit 4, and submitted it.  The document represents his initial grievance regarding smoking at the MPDC.  He made duplicate originals.  He placed one of the documents in an envelope marked Madison Parish Screening Officer, and deposited that where the officer sits in the dormitory.  However, he never received a response thereafter.  Thus, he wrote another grievance, dated 10/6/2012, and placed it in the "flap," in the dormitory.  Again, however, he received no response.  Accordingly, Williams submitted another grievance in December, but without any response.

Williams did not tell the guards that he was not receiving responses to his submissions.  However, he did write to the acting warden, Major Antonio Johnson, via his uncle.  He mailed a letter inside of a letter to his uncle, so his uncle could forward it to Major Johnson.  His uncle forwarded the letter to Johnson on January 16, 2013.  That same date, Williams was "called out."  During this meeting, Johnson talked with Williams about secondhand smoke, education, and earning good time.  Johnson told Williams that there were no non-smoking dormitories in the State of Louisiana.  Williams returned to his dormitory and started sending ARPs.  However, he never received a response.

4

Williams thought that he sent a letter to the sheriff, but was unsure.  He could not remember whether he wrote the sheriff.  Nonetheless, Williams conceded that he was familiar with the grievance forms.

Williams has not smoked since he was a teenager.  He was housed in "B" dormitory at the time of the hearing.  He reported to the nurse that he has been having headaches and sinus problems.  However, he has not seen a physician for his exposure to tobacco smoke.  Williams conceded that his claim was for future health damages, but he would like to receive monetary compensation.  The hearing was the first time that Williams had met fellow plaintiff, Gilbert Burke.

2)    Gilbert Burke

At the time of the hearing, Burke had been incarcerated at the MPDC for two and one-half years.  He was convicted of identity theft.  He was aware of the grievance process, and recognized Exhibit 3 as an inmate grievance form.  Burke acknowledged that inmates were supposed to place completed grievance forms in the mailbox.  However, because the grievances were not being received, the inmates started handing them to the deputies.

Burke understood that if he was not satisfied with the initial step of the grievance process, then the next step was to go to the warden.  Burke explained that he never received a response to his initial grievance.  In fact, he only once ever received a response to a grievance, but it did not pertain to cigarettes.

Burke completed about ten grievances regarding smoking in the jail.  He deposited perhaps half of them in the box.  He gave one to a deputy.  He conceded, however, that he never proceeded to step two with any of his grievances because he never received an answer to his first

5

step grievance(s).

Burke has a copy of his step one grievance, but not his step two grievance.  Burke never went to the warden with his smoking grievances.  He did not approach the warden to complain about not receiving a response to his ARP because Burke believed that it was a "joke," and that "they" would not respond anyway.  He also never wrote a grievance to the sheriff, only a letter complaining about smoking.  The sheriff did not really know what was going on at the MPDC.

There were designated smoking areas inside of the dormitories.  At the time of the hearing, the MPDC had just started enforcing the smoking policy.

Burke opened his own business at the MPDC and was buying cigarettes for $4 from the commissary and reselling them for $3.[2]  It was a means for him to make extra money.  He used to smoke about 13 years earlier.

At the hearing, Burke asked the court to subpoena MPDC surveillance videos from J Dormitory for July 15, 16, & 17, 2014.  Burke, however, is not housed in J dormitory.  He only went there to use the telephone.  At the time of the hearing, Burke was housed in administrative segregation.

Burke has received threats from other inmates for filing this lawsuit.  He wants to be moved to a state-owned and operated facility where they respect government smoking policies.  His alleged injuries from exposure to ETS include headaches, shortness of breath, and the smell of it.

3)    Larry Cox

Larry Cox is the Madison Parish Sheriff  – a position that he has held for the past 18

---

[2]  The court is not sure how Burke profited financially from this strategy.

years.  As of January 1, 2014, LaSalle Mangement Co. is managing the parish jail.  The jail has a

no smoking policy inside its buildings.  The inmates can buy cigarettes, but they have to smoke

them outside of the buildings in the recreation yards.  The deputies are not supposed to smoke

inside buildings either.

Cox confirmed that the Exhibit 2 reflects the jail's smoking policy.  If an inmate violates

the smoking policy, then he is written up for it and disciplined as the deputies see fit.  In fact,

write-ups are issued every day.

The jail has a written administrative remedy procedure.  It was in effect at the time Cox

ran the jail and at the time of the hearing.  The procedure usually starts with a complaint to the

captain.  If the inmate is unhappy with the captain's response, then he may proceed to step two,

which is the major or warden.  If the inmate is dissatisfied with the warden's response, then it

eventually escalates to the sheriff.  Some inmates have successfully exhausted the entire three

step appeal process.

Cox has never ignored a letter from an inmate.  To his knowledge, however, he has never

received a letter from Burke or Williams.  If he had received a letter, he would have taken action.

Before the hearing, Cox went through two or three boxes full of inmate letters.  However, he did

not discern any letters with Williams or Burke's names on them.

Whenever Cox goes into the prison dormitories he does not observe people smoking with

clouds of smoke.  If he *did* observe someone smoking in the dormitory, he would call one of the

deputies to handle the matter.

4)    <u>Antonio Johnson</u>

Johnson is a major working for LaSalle Management at the MPDC, where he has worked

since 1994.  From 2012 until January 1, 2014, he served as acting warden, following the former warden's death.

Blank grievance forms are available in the control center of the inmate dormitories.  An inmate simply needs to approach the "flap" and request one.  Sometimes the facility is out of forms, but copies can be made and forwarded to the control room.  Once a grievance form is received, it is forwarded to the front office, which will pass the grievance on to Johnson.  Johnson will review the complaint and respond to it.  The deputy assigned to respond to the grievance will complete the response.

If the inmate is not satisfied with the response, he may request a warden's review.  The warden then will provide an answer.  If the inmate remains dissatisfied, the matter is elevated to the sheriff, or sometimes the DOC.

As acting warden, Johnson has received second step grievances.  It is his practice to answer the grievances, and sometimes just talk to the inmate.  Sometimes, they were able to come to a common agreement.  If still dissatisfied, then the inmate can take the matter to the sheriff.

Johnson did not recall receiving any grievances from Williams.  However, he did receive a letter concerning secondhand smoke from Williams' uncle.  Johnson called Williams' uncle, and advised him that smoking was not permitted in the dormitories.

Johnson also spoke to Williams about the matter.  Williams wanted a transfer to another place where there was no smoking at all.  Johnson advised Williams that he could not ship everyone to their facility of choice.  After the conversation, Williams never said anything to Johnson about smoking again.  To Johnson's knowledge, Williams never sent a third step

8

grievance to the sheriff.  Johnson never saw the October and December letters that Williams purportedly submitted at step one.

Johnson saw that Burke wrote to a him and a captain about smoking.  Johnson discussed the matter with Burke, who informed him that he wanted a transfer to another facility.  Johnson advised Burke that smoking was prohibited inside of the buildings.  Johnson never spoke to Burke again.

If an officer observes an inmate smoking inside, the officer is supposed to write-up the inmate.  Johnson reviewed his files and confirmed that some inmates received write-ups for smoking.  Sometimes, however, the officer simply will admonish the inmate.

When asked whether he saw smoke in the dormitory at any time, Johnson replied, "No sir, not a big cloud of smoke, no."

Johnson researched Burke's commissary records and discovered that he bought tobacco products on a regular basis.

On January 22, 2013, Johnson went and checked the dormitories to see whether anyone was smoking inside.  However, he did not observe any smoke.  Johnson also sent Lester Turpin to keep a record of any smoke.

In addition, Johnson reviewed surveillance video from January 22, 2014, that depicts the dormitory where Williams was housed.  The dormitory houses close to 100 inmates.  Johnson did not observe any individuals smoking in the video.  He also did not see any clouds of smoke throughout the dormitory.  Furthermore, Johnson did not observe any smoking on the video of Burke's dormitory.  The videos are from different dates

Johnson hates cigarette smoke, and thus would discipline any individuals he observed

9

smoking in the dormitory.

5)    <u>Gerald McCloud</u>

McCloud is a lieutenant employed by LaSalle Management.  He is a non-smoker and does not like cigarette smoke.  McCloud has not observed smoking in the dormitories.  However, he has seen officers issue write-ups to inmates.  McCloud would investigate any complaints of smoking.

Williams never complained to McCloud about secondhand tobacco smoke.  Burke, however, told McCloud that he did not want to live in a population dormitory any longer.  He wanted to be "shipped."  To accommodate his request, McCloud moved Burke to administrative segregation.  Burke, however, really wanted a transfer to another facility.  Eventually, a trustee asked Burke if he wanted to move to Delta dormitory.  Burke assented, and McCloud approved his reassignment to the new dormitory.  Burke was in administrative segregation for less than one month.  After Burke was reassigned to Delta dormitory, Burke never complained to McCloud again.  To McCloud's knowledge, Burke never wrote to the sheriff complaining about secondhand tobacco smoke.

6)    <u>Michael Gordon</u>

Michael Gordon is an inmate at the MPDC, where he has resided since 2012, while serving his sentence on a 2003 second degree murder conviction.  He stated that the MPDC did not have a smoking policy.  However, two days before the hearing, the facility posted signs, and began to prohibit smoking in the dormitories.  Within the past couple of days, inmates have received write-ups for smoking.  The facility also only recently started allowing inmates to go

10

into the yard to smoke.  Before that, an inmate normally did not get to see the yard.

Gordon has observed Burke purchase cigarettes from the prison commissary and re-sell them.  He has known Burke since he was a child.  Gordon has observed Burke complain to the guards about an inmate smoking.

Gordon, himself, has filed many grievances complaining of smoke.  However, he did not have any grievances with him because the guards had confiscated them.  Gordon has not provided the guards with the names of inmates who smoke.  A lot of inmates were smoking in the dormitory on May 31, 2014.  The video from that date would confirm smoke in the dormitory.

7)      Toby Matt

Toby Matt is an inmate at the MPDC, where he has resided since November 2, 2011, while serving his sentence for a 2011 vehicular homicide conviction.  Matt stated that the facility is supposed to be non-smoking, but it sells cigarettes.  Moreover, inmates are permitted to smoke freely in the dormitories wherever they like – the bed area, television area.  The facility only recently installed no smoking signs.  If someone were to report a fellow-inmate for smoking, then he would be labeled a "rat," and beaten up.

Matt no longer smokes.  He recalled Williams filing an administrative grievance complaining about secondhand smoke.  He also remembered Williams writing a grievance two to three times over, complaining that he was a non-smoker, and wanting to be moved.  Williams did not use a formal grievance form because he was unable to obtain one.  Matt recalled Williams writing to Major Johnson.

In a dormitory with approximately 120 inmates, Matt estimated that perhaps 60 to 70

11

smoked at any given time.  Thus, the air in the dormitory stayed blue.  Matt said that the blue

smoke may not be visible on video; rather, one has to visit the dormitory to view it personally.

The non-smoking policy was posted on the wall when Matt arrived in 2011.  However, the

facility has since added more signage.

8)    <u>Zenus Fruge'</u>

Zenus Fruge' is an inmate at the MPDC, where he has resided since December 13, 2011.

He has convictions for attempted possession of a firearm by a convicted felon and for attempted

simple possession of illicit drugs.  Fruge' testified that there was no smoking policy at the

MPDC; everyone just smoked freely in the dormitories.  The MPDC only recently started

allowing inmates to go outside for an hour or so every couple of days.  Before that, an inmate

usually only went outside once every six months.  Previously, the only way an inmate could

receive permission to go outside for 45 minutes or so, was to bribe a guard with a cold drink.

Approximately two days before the hearing, the guards posted no-smoking signs, and

started issuing write-ups for smoking .  Before then, there were no placards in the dormitories.

If an inmate were to complain to a captain or lieutenant about another inmate smoking,

then the reporting inmate would be "jumped," as soon as the guard departed.  If a guard were to

catch an inmate smoking, the guard would discipline the inmate.  However, they tell the inmates

"don't let us catch you smoking in the dorm . . . or put it out when we come in here . . . "

Fruge' observed Williams submit ARPs to Major Johnson on multiple occasions.

However, the facility never answers anything.

Fruge' has known Williams since 2012.  However, he never saw Burke before the

hearing.

About 100 out of 120 people in C Dormitory were smokers.  The surveillance video from May 2014 should confirm this.  All of the ceilings are brown from cigarette smoke.  One can smell the smoke throughout the dormitory.  At any given time, probably ten inmates are smoking.

9)   Courtney Plumbar

Courtney Plumbar is an inmate at the MPDC, where he has resided since the first week of January 2013, while serving a sentence for a burglary conviction.  Plumbar has never noticed any non-smoking signs in the facility until recently – less than one week earlier.  Every day, at least 80 percent of the inmates in the dormitory smoke cigarettes.  At any given time about 70 percent of them are smoking.  The cigarette smoke is unavoidable.  One can observe the tobacco residue on the walls and ceilings.

Plumbar has written seven grievances, but never received a response.  He has known Williams for the entire time that he has been in C dormitory - one year and seven months.  He does not know Burke.  If an inmate were to report a fellow-inmate for smoking, he would be labeled a "rat."

## II.   Hearing Exhibits

**Def. Exh. 1)**   MPDC Administrate Remedy Procedure

This eight page document is entitled "Administrative Remedy Procedure."  It specifies that an offender may file a grievance under the Administrative Remedy Procedure when a policy, condition, or incident at the facility personally affects the offender.  A grievance is defined, *inter alia*, as a written a complaint by an offender or on the offender's behalf.  If a grievance is filed against an employee, the employee may be the Step One respondent.  Written copies of the procedure are to made available in the prison law library.  The policy also is to be posted in areas

13

where employees and offenders frequent.

At each step of the procedure, offenders will receive written answers.  Offenders also will be provided directions for proceeding to the next step, with appropriate forms supplied for that purpose.

The warden will screen every grievance before assigning it to a Step One respondent.  An offender should attempt to resolve a problem without resorting to a grievance by discussing the matter with prison employees.

The offender begins the procedure by completing a grievance and placing it in a box for that purpose.  Offenders who are in disciplinary or lock down status may hand the grievance to any employee.  Completed forms will be collected and delivered to the warden every day.  A grievance may be any written communication that contains the phrase "This is a grievance under the Administrative Remedy Procedure," or a completed standardized form provided by the sheriff.  No grievance will be rejected because it is not a standard form.  However, no written communication will be accepted as a grievance unless it contains the phrase, "This is a grievance under the Administrative Remedy Procedure."

At Step One of the procedure the offender must complete the grievance form and place it in the collection box for delivery to the warden within 30 days of the alleged incident.  The offender should keep a copy of his completed form for his own record.  The grievance will be screened and forwarded to the staff member who can best respond to the matter.  This staff member is the Step One Respondent.  The warden's office will let the offender know if his grievance is being processed or if it was rejected.   The Step One Respondent will respond to the offender within 15 days from the date that the completed grievance was referred to him by the

14

warden.

An offender who is not satisfied with the Step One response may request a review by the warden by signing the bottom of the response to his grievance.  The Step Two grievance must be deposited in the collection box within five days from receipt of the offender's Step One response.  The warden shall ensure that the offender receives his "Review Decision of the Warden's Review Decision" in writing within 25 days after the warden receives the request for Step Two review.

An offender who remains dissatisfied with the results of the Step Two review may appeal to the sheriff by signing the bottom of the Warden's Review Decision.  Within five days of the date of the offender's receipt, the offender must deposit "Form 3" in the collection box.  A final decision will be made by the sheriff or his designee within 40 days after the sheriff receives the appeal.

All grievances must be processed from beginning until end within 90 days unless an extension of time has been granted.  If an offender has not received a response within the applicable time frame, then he may proceed to the next step in the Administrative Remedy Procedure.

The sheriff reserves the right to implement changes to enhance the grievance process.  For instance, employees may be assigned to collect and deliver grievance and appeal forms each day, in lieu of collection boxes.

**Def. Exh. 2**   DOC Smoking Policy

The document is entitled, "Field Operations, Adult Institutions, Smoking Policy for Offenders," and is dated 13 February 2009.  It specifies that "[s]moking inside areas of every

public building and place of employment operated by the Department, including contract and

cooperative endeavor agreement work release programs is prohibited for all employees, visitors

and offenders beginning August 15, 2009 . . .”  In addition, “no smoking” signs are to be posted

in strategic areas.

**Def. Exh. 3**      Blank Inmate Grievance Forms

These documents include a blank grievance form, a blank response to grievance form,

and a blank warden's review decision.  The forms contain instructions for completion and

submission of the forms.  Specifically, if the offender does not receive a response to his initial

grievance within 30 days, then he may file a request for warden's review within five days

thereafter.

**Def. Exh. 4**      Hand-written Grievances Signed by Lawrence Williams

The earliest document is entitled “Administrative Remedy Procedure,” dated October 6,

2012, addressed to Captain Brook, and signed by Lawrence Williams.  In this hand-written letter,

Williams complained of ETS exposure, officers supplying inmates with drugs and cell phones,

the inability to accrue good-time credit, and corruption.

The second document (chronologically) is entitled “Administrative Remedy Procedure

(ARP),” dated November 24, 2012, addressed to Major Johnson, and signed by Lawrence

Williams.  In this document, Williams referenced his previous request to Captain Brooks, and

again complained of exposure to ETS.  He requested an immediate transfer or threatened to file a

§ 1983 action against the facility.

The third document (chronologically) is entitled “Administrative Remedy Procedure,”

dated December 12, 2012, addressed to Major Johnson, and signed by Lawrence Williams.  In

16

this missal, Williams documented that he still had not received a response from Johnson to his prior request.  Williams re-urged his ETS complaints, complained of breathing issues, requested a transfer, and threatened legal action.

**Def. Exh. 5)**   Voluntary Statement of Lester Turpin, dated January 22, 2014

This document is a handwritten statement completed by Lieutenant Lester Turpin in which he documented that he observed no smoke in C Dormitory from approximately 6:00 a.m. until 10:15 a.m. on January 22, 2014.  Although plaintiff(s) objected to the statement on the basis of hearsay, defendant argued that the evidence was admissible pursuant to the business records exception.  The court need not exclude the evidence, however, because Turpin's four hour observation does not materially affect the court's resolution of the case.

**Def. Exh. 6)**   Commissary Records of Gilbert Burke

This exhibit is approximately 40 pages in length.  It reflects Burke's commissary purchases from May 2012 through December 20, 2013.  The invoices confirm Burke's frequent and regular purchase of tobacco ("Bugler Packs") and Camel cigarettes.

**Pl. Exh. 8)**   Inmate Grievance Forms Completed by Gilbert Burke

This exhibit reflects grievances completed by Gilbert Burke on official "Inmate Grievance Forms."  In the first form that is dated April 26, 2013, Burke asked to be moved to a non-smoking dormitory or a DOC facility because of his shortness of breath.  The "Warden Use Only" section of the form remained blank.

The second form is dated October 15, 2013, signed by Burke, and requested a transfer to Dixon or Hunt Correctional facilities.  The "Warden Use Only" section of the form was blank.

The third form is dated October 19, 2013, signed by Burke, and requested a transfer to

17

DOC.  Burke complained that he had been trying to see a doctor for two weeks about his chest.

The fourth inmate grievance is dated June 11 and signed by Burke.  In this document, he complained of sleep deprivation because Lt. T. Johnson kept the lights on all night long.

In a document is entitled "Response to Grievance," Tavares Johnson replied to Burke that he kept the lights on for the safety of the inmates.

In a document entitled "Inmate Request Form," dated November 3, 2012, Burke complained that he had sent a grievance on October 15, 2012, complaining of chest pains.

**Def. Exh. 9)**   DVDs of Surveillance Video from the MPDC

This exhibit includes seven DVD discs containing video footage from the MPDC.  Some of the videos overlap.  The first video was taken on January 22, 2014, and included two five-minute clips from around 8:03 a.m.  The next video was taken on May 26, 2014.  It included a montage of footage from up to 32 cameras.  However, as many as 20 of the camera shots remain blank during the recorded period which lasts from 19:45 until 22:11.

Another disc captured footage from May 30, 2014.  It included video from up to 32 cameras mounted in various places at the MPDC.  As many as 20 of the camera views remain blank during the recording which extends from 06:14 until 07:21.

The next video captured footage from June 4, 2014.  It included video from up to 32 cameras mounted in various places at the MPDC.  As many as 20 of the camera views remain blank during the recording which extends from 9:14 until 11:11.

The last video captured footage from June 11, 2014.   It included video from up to 32 cameras mounted in various places at the MPDC.  As many as 20 of the camera views remain blank during the recording which extends from 8:15 until 8:21.

18

No clouds of cigarette smoke are visible in any of the footage.  In addition, the footage does not reveal anyone smoking.

**Pl. Exh. 10)**  <u>Hand-Drawn Depiction of Dormitory</u>

This exhibit is Burke's hand-drawn depiction of the dormitory.  It indicates that there are smoking areas in both corners of the area close to the rear exit.

**Def. Exh. 12)** <u>Deposition of Lawrence Williams</u>

This exhibit is a 21 page transcript of Lawrence Williams' deposition that was taken on January 22, 2014.

<u>**Analysis and Resolution of Disputed Facts**</u>

"An evidentiary hearing consistent with *Flowers v. Phelps* amounts to a bench trial replete with credibility determinations and findings of fact." *Adkins v. Kaspar*, 393 F.3d 559, 563 (5th Cir. 2004) (citations and internal quotation marks omitted).  To establish an Eighth Amendment violation as a result of exposure to excessive levels of ETS, plaintiff must establish by a preponderance of the evidence that 1) objectively, he is "being exposed to *unreasonably high levels* of ETS . . ." and 2) prison authorities are deliberately indifferent to his plight - the subjective component. *See Richardson v. Spurlock*, 260 F.3d 495, 498 (5th Cir. 2001) (citing *Helling v. McKinney*, 509 U.S. 25, 33-35, 113 S.Ct. 2475, 2481-482 (1993)).

Exhaustion of administrative remedies is an affirmative defense; thus, the burden is on *defendant* to establish by a preponderance of the evidence that plaintiff failed to exhaust available administrative remedies. *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (citation omitted).  "Preponderance" means that it is more likely so, than not so. *Matter of Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1164 (5th Cir. 1993) (citation omitted).  It remains within the

province of the finder of fact to weigh conflicting evidence and inferences and to determine the credibility of witnesses. *See Yarrito v. Cook*, 1995 WL 17788756 (5th Cir. June 22, 1995) (unpubl.) (citation omitted).

At the close of the presentation of evidence on the issue of administrative exhaustion, and again at the close of all evidence, defendants petitioned the court for a "judgment as a matter of law." In a bench trial, however, "the appropriate vehicle for dismissing a case as a matter of law at the close of plaintiff's evidence is a Rule 52(c) judgment on partial findings." *Weber v. Gainey's Concrete Products, Inc.*, 1998 WL 699047, *1 n1 (5th Cir. Sept. 21, 1998) (unpubl.) (citation omitted). Rule 52 provides, in pertinent part,

> **Judgment on Partial Findings**. If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed.R.Civ.P. 52(c).

When deciding a case pursuant to Rule 52(c), the court is not required to make any special inferences or construe the facts in the light most favorable to the plaintiff. *Weber, supra*. Moreover, "[a] judgment on partial findings may be entered by the court at any time it can appropriately make a dispositive finding of fact on the evidence." *Id*.

There is some question whether a Rule 52(c) motion is an appropriate vehicle to decide the case when, as here, the movant enjoys the burden of proof as to the dispositive issue. In this case, however, some of plaintiff's witnesses offered testimony regarding the filing of grievances. This evidence was introduced *after* defendant urged his initial motion for judgment on partial

findings.  Because this evidence is germane to the issue of administrative exhaustion and should

be considered, defendant's initial motion is improvident.  Furthermore, defendant's renewed

motion for partial findings at the close of all the evidence serves no purpose and is superfluous.

In short, defendant's motion is not well-taken.

   During the hearing, plaintiff requested copies of video surveillance from July 12 & 14-17,

2014.  However, given the undersigned's recommended disposition of the matter, *see* discussion,

*infra*, plaintiff's request is moot.

**Findings**

## I.    **Exhaustion of Administrative Remedies**

a)    <u>Law</u>

   Pursuant to 42 U.S.C. § 1997e, as amended by the Prison Litigation Reform Act

("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of

this title or any other Federal law by a prisoner confined in any jail, prison, or other correctional

facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

Exhaustion is mandatory, and is required even where the relief sought cannot be granted by the

administrative process.  *Woodford v. Ngo*, 548 U.S. 81, 85, 126 S.Ct. 2378, 2382-83 (2006)

(citations omitted).  All "available" remedies must be exhausted, whether speedy and effective,

or not.  *Porter v. Nussle*,  534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002).  "Proper exhaustion

requires that the prisoner not only pursue all available avenues of relief but also comply with all

administrative deadlines and procedural rules."  *Johnson v. Kukua*, 342 Fed. Appx. 933, 934 (5th

Cir. 2009) (citing *Woodford, supra*).  An untimely or otherwise procedurally defective

administrative grievance does not satisfy the exhaustion requirement.  *Id*.

21

"[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter, supra* (citation omitted).  An inmate is required to "exhaust his remedies, irrespective of the form of relief sought, injunctive or monetary." *Richbourg v. Horton*, 2008 WL 5068680 (5th Cir. Dec. 2, 2008) (unpubl.) (citation omitted). Exhaustion further applies to claims brought against defendants in their official and/or individual capacities. *See e.g., Williams v. Henagan*, 595 F.3d 610, 618 (5th Cir. 2010); *Hines v. Texas*, 76 Fed. Appx. 564 (5th Cir. Sept. 29, 2003) (unpubl.).

The Fifth Circuit has consistently held that an inmate's ignorance of a prison's grievance procedures does not excuse his noncompliance.  *Aguirre v. Dyer*, 233 Fed. Appx. 365 (5th Cir. 2007) (citation omitted); *Simkins v. Bridges*, 350 Fed. Appx. 952, 953-954, (5th Cir. 2009) (citation omitted); *Plaisance v. Cain*, 374 Fed. Appx. 560, 561 (5th Cir. 2010) (citation omitted). Nonetheless, inmates should have "avenues for discovering the procedural rules governing their grievances." *Dillon v. Rogers*, 596 F.3d 260 (5th Cir. 2010) (citations omitted).  When an inmate has no means of verifying the administrative grievance process, then misleading information by prison officials may make remedies unavailable.  *Id*.  "If impediments to filing grievances render remedies unavailable at one facility, remedies may become available again once a prisoner has been transferred, unless there are other problems at the new facility."  *Dillon*, 596 F.3d at 267-268 (citing *Bryant v. Rich*, 530 F.3d 1368, 1379 (11th Cir.2008)).  Stated another way, the grievance filing period is tolled only so long as the inmate is actually impeded from invoking and exhausting the process.

A prisoner is required to exhaust all steps of a grievance process even if the prison fails to

respond to his grievances at an earlier step in the process.  *Hicks v. Lingle*, 370 F. App'x 497, 499

(5th Cir. 2010); *Ates v. St. Tammany Parish*, Civ. Action No. 13-5732, 2014 WL 1457777 (E.D.

La. Apr. 15, 2014).  Moreover, to the extent that language on the form or policy regarding

subsequent step review is phrased in discretionary rather than mandatory terms, the prisoner still

must exhaust all "available" steps.  *Ates, supra* (and cases cited therein).  In short, the courts will

not "will not read futility or other exceptions into statutory exhaustion requirements where

Congress has provided otherwise."  *Booth v. Churner*, 532 U.S. 731, 741, 121 S. Ct. 1819, 1825,

n. 6 (2001).

b)      <u>The MPDC had an Available Administrative Remedy Procedure</u>

        The evidence establishes that the MPDC had a three step administrative remedy

procedure in effect during the relevant period.  The first step requires an offender to complete a

grievance form, or write a letter so identified, and place it in the collection box for delivery to the

warden within 30 days of the alleged incident.  If an offender is dissatisfied with the Step One

response, he may request a review by the warden by signing the bottom of the response to his

grievance, and depositing it in the collection box within five days from receipt of the offender's

Step One response.  Finally, an offender who is not content with the results of the Step Two

review may appeal to the sheriff by signing the bottom of the Warden's Review Decision, and

depositing it in the collection box.  If an offender does not receive a response within the

applicable time frame, then he may proceed to the next step in the Administrative Remedy

Procedure.

c)      <u>Burke Failed to Exhaust All Available Administrative Remedies</u>

        The undersigned finds that defendants have established by a preponderance of the

evidence that plaintiff did not exhaust all available administrative remedies.  At minimum, the court is compelled to find that plaintiff did not complete the second and third steps of the grievance process.  Even if the court were to credit plaintiff's testimony that he submitted an initial grievance to the captain and/or the warden, he did not adduce evidence of a second or third step grievance.  Indeed, defendants adduced uncontroverted evidence that the sheriff never received an appeal from Burke.  Moreover, Burke characterized the whole process as a "joke."

Burke was familiar with the grievance process, and was no stranger to filing grievances. Unlike Williams, Burke was able to obtain grievance forms that contained further instructions on the grievance process.[3]

d)      Remedy for Failure to Exhaust

The plain language of the PLRA precludes any further action on plaintiff's claims until he has fully exhausted the administrative remedy procedure.[4]  Dismissal is the remedy, and although it is typically without prejudice,[5] the court is authorized to dismiss plaintiff's complaint with prejudice to his right to re-file it, in forma pauperis ("IFP"):

[b]y choosing to file and pursue his suit prior to exhausting administrative

---

[3]  Going forward, it may behoove the MPDC to institute some form of a computer log to track grievances and the facility's response(s).  It appears that some grievances may be slipping through the cracks and/or going unanswered.

[4]  *See Wendell v. Asher*, 162 F.3d 887, 890-91 (5th Cir.1998) (overruled by implication on other grounds by *Jones v. Bock*, 549 U.S. 199, 214, 127 S. Ct. 910, 920 (2007) (§ 1997e(a) "plainly requires that administrative remedies be exhausted before the filing of a § 1983 suit, rather than while the action is pending . . . [t]o hold otherwise would encourage premature filing by potential litigants, thus undermining Congress' purpose in passing the PLRA, which was to provide the federal courts some relief from frivolous prisoner litigation.").

[5]  *See e.g., Plaisance v. Cain, supra*; *Cooper v. Quarterman*, 342 Fed. Appx. 12, 13 (5th Cir. 2009).

24

> remedies as required, [plaintiff] sought relief to which he was not entitled-that is,
> federal court intervention in prison affairs prior to the prison having had the
> opportunity to address the complaint within its grievance procedures. We
> therefore affirm the district court's order dismissing [plaintiff]'s action with
> prejudice for purposes of proceeding IFP.

*Underwood v. Wilson*, 151 F.3d 292, 296 (5th Cir. 1998) (overruled by implication on other grounds by *Jones v. Bock*, 549 U.S. 199, 127 S.Ct. 910, 920-21 (2007)).

The foregoing approach is appropriate here.  Accordingly, if plaintiff exhausts his administrative remedies with respect to the claims raised herein, he may present these § 1983 claims again, but may not proceed *in forma pauperis* to do so.[6]  In the interim, because plaintiff failed to exhaust administrative remedies, the court cannot reach the merits of his claim.  *Marshall v. Price*, 239 F.3d 365, 2000 WL 1741549 (5th Cir. Nov. 6, 2000) (unpubl.).[7]

e)      Plaintiff's Motion for Appointment of Counsel, Transfer, and Claims of Retaliation

The undersigned's recommended disposition of this case moots plaintiff's motion for appointment of counsel.  Furthermore, because plaintiff recently was transferred to another facility [doc. # 35], his request for transfer, supported by complaints of retaliation, are also moot.

_____

[6]  Of course, administrative exhaustion requires "proper" exhaustion, i.e., compliance with an agency's deadlines and other critical procedural rules.  *Woodford, supra*.  At this point, plaintiff's delay effectively may foreclose his ability to properly exhaust available administrative remedies.

[7]  Upon consideration of the report and recommendation, should the District Court determine that the plaintiff exhausted administrative remedies, the undersigned would find, *based on the evidence presented at this trial*, that plaintiff was exposed to excessive levels of ETS in dormitory at the MPDC.  In so finding, the undersigned credits the testimony of the plaintiff and his fellow-inmates.  Moreover, the tone of Antonio Johnson's response to the question of whether he observed clouds of smoke in the facility, suggested that, while there may not be *clouds* of smoke, there was some level of smoke present.  Furthermore, Johnson was aware of plaintiff's exposure to ETS.  Nevertheless, plaintiff failed to prove that his ETS exposure caused any of his unsubstantiated medical ailments.  Moreover, he has been transferred to another facility, and thus will not suffer continued ETS exposure at the MPDC.  Thus, plaintiff has not established any right to damages or injunctive relief.

## Conclusion

For the foregoing reasons,

IT IS RECOMMENDED that the motion for judgment on partial findings (incorrectly styled as a "motion for judgment as a matter of law") [doc. # 29] filed by defendants Sheriff Larry Cox, Major Antonio Johnson, and Captain McCloud be DENIED.

IT IS FURTHER RECOMMENDED that plaintiff Gilbert Burke's motion for copies of video footage [doc. # 30] be DENIED.

IT IS FURTHER RECOMMENDED that plaintiff Gilbert Burke's claims against defendants Sheriff Larry Cox, Major Antonio Johnson, and Captain McCloud be DISMISSED, without prejudice, on the merits, but DISMISSED with prejudice for purposes of proceeding in forma pauperis pursuant to 28 U.S.C. § 1915(d).

IT IS FURTHER RECOMMENDED that plaintiff's motion for appointment of counsel and request for transfer with associated complaints of retaliation [doc. # 34] be DENIED, as moot.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS**

26

**REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 23rd  day of September 2014.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE